The next case for argument is 14-1361, University of Utah Research v. Ambry Genetics Corporation. Good morning and may it please the Court. Jonathan Singer for Appellant Myriad and with me is my colleague Ms. Deanna Reichel and Mr. David Mangum who also represent the other appellants on appeal. Your Honors, this is a very important case. Of course, it's been to this Court before and to the Supreme Court in the context of the patents, not in the context of this litigation. In those decisions, both the Supreme Court and this Court stated that as the discoverer of the BRCA genes, Myriad was in an excellent position to patent new applications of the knowledge of that gene. In its analysis of, I'll start with the method claims, for example, Method Claim 7, the District Court dissected that discovery out of the claim and by doing so, applied a standard that the Supreme Court had rejected 35 years ago in Parker v. Fluke. The Method Claim 7, for example, has a BRCA-related probe to make the comparison between the germline sequence of the native DNA and the BRCA gene that had never been used before. And that, of course, is an application of the knowledge of the BRCA gene to the technique of using probes. I guess I'm a little unclear on your argument and I think you doubled down on it when you wrote the additional briefing with regard to the impact of ALICE v. CLF. You're saying that you have to look at the entire claim? Is that your argument? I guess I'm just not understanding the Supreme Court, in my view, so you can tell me what I'm misreading, was quite clear in Mayo, I thought, that you take away the abstract idea, the law of nature, and then you look at any additional steps to determine whether or not those additional steps were well understood, routine, conventional, blah, blah, blah, and those steps, when viewed as a whole, add nothing significant. So in this case, when you're talking about the hybridization and all of these other things, how were those not looking at those in their entirety, conventional, routine, non-routine, and so forth, not conventional? Let me answer the first question and the second one. The first question, I think that overreads what the Supreme Court is saying. The Supreme Court said you look at the other steps, and I agree, it says look at them on their own, but it also says to look at the claim, if you will, as an ordered combination. That's what the Supreme Court did in Ellis, that's what it did in Deere. In Parker v. Fluke, let's remember, the standard was to put to one's... Help me out. Take the Chief Judge's take on the case, and your take on the case, and run the analysis both ways. Under your view, you look at the claim as a whole, so you look at the portion of the claim that has what we'll call some non-patentable subject matter in it, and then you look at what's surrounded it, and you enjoy it as this whole. So I want you to do that analysis for me, and then when you're done, come back and do it the way Judge Gross said, when you take the non-patentable subject matter and go park it, and then look at what's left. Let's do that first. Take what's left. Now, I think what the Chief Judge said was, why isn't what's left conventional, known, non-unusual matter? Okay, so let's do the first question. How do you look at it as a whole? It's a method of screening, in this case, for germline alterations, and you look at... Now, is screening known or unknown? Do people know how to screen? In general, people knew that screening... And in playing with genetic stuff, do people know how to screen? Mary did not invent the method of screening, as a general matter. But if you look at the overall claim as a whole, you have a method of screening for an alteration in the bracket gene that includes a bracket probe, and then detecting that bracket probe hybridization product. As a whole, is that directed to patentable subject matter or not? As we look at invention, where we just had a mathematical formula, in the whole, that claim was not. In the whole, this claim is. If we look at them in... Suppose this claim didn't have the additional stuff, which you agree is conventional screening. And it just said, make this comparison. Would that be patentable subject matter? No. This court already ruled that the comparison was not, in and of itself, it was an abstract idea. But why does adding something which is conventional, which Alice and other cases seem to say doesn't confer patentability, confer patentability? It depends on what you mean by conventional. If by conventional, you define it as, did Myriad invent probes? Then you've answered the question. I concede that. That was the argument below, that Myriad had to identify a new process of using probes. But if you answer the question or ask the question with respect to the BRCA1 probe, that is a probe that Myriad invented. It's not a conventional step in the method of screening. It had never been used before. We can't look at these authorities and simply take away the unpatentable subject matter from all consideration. That was what was done in Parker v. Flick. That unpatentable subject matter was treated as part of the prior art. And then that test was overruled in Deere, that specific test. It said, no, you must look at the claims as a whole and not treat it that way. So I think that is the question. What does conventional mean? Do you define it at the level of prior art? Did Myriad invent probes, primers, methods of screenings? That will answer the question. I wonder if there isn't another question inherent in here. You argue at great length that Judge Bryson mentioned Claim 21 of the patent and you want to read the Supreme Court as approving his suggestion that Claim 21 was patentable subject matter. But isn't there a huge difference between Claim 7 and 8 and Claim 21 in the sense that Claims 7 and 8 are very broad and they would apply to the termination of any mutations, whereas Claim 21 is directed to specific mutations that have been identified as markers for cancer? Well, I would beg to differ with you, Judge, because we were told in the original Myriad decision that specifying the specific alterations would not have saved or narrowed, if you will, Claim 1. So while we do have a list, if you will, of particular... There is a difference between the claims. There is a difference between the claims. And the difference is the one that I stated, right? That is the only difference. That difference being articulated in the prior decision is not significant enough in the context of Claim 1 to really change matters. So I agree with you, there is a difference in the claim, but it's already been held by this Court as not to be significant enough, at least in the context of Claim 1 of the 441 patent. And again, it really does depend how you define this term conventional. I think it's important not to simply say that patentees who discover new natural laws, discover new natural phenomena, are also obligated to then develop an entirely new tool for assessing that. If that had been the case, we wouldn't be here. Myriad would have a patent on a new process of using probes that it had invented. Where did we say in our original decision that identifying the specific mutations wouldn't make a difference in Claim 1? You're going to take me a moment, Your Honor. I believe it was in limiting it to a particular technical environment. At page, Your Honor, I happen to have highlighted it, 689F31334, limiting the comparison to just the bracket genes, whereas in the case of Claim 1 of the 999 patent, to just the identifications of particular alterations fails to render the difference. So you've identified the question that needs to be answered. I would suggest to you that the authorities of the Supreme Court do not require Myriad to have invented a new process of the ilk that the District Court required. A clue, one clue we can see in that is that in the AMP decision itself, that's of course the most important authority we have here, the Supreme Court identified cDNA as patentable. The decision also talks about, of course, Myriad did not invent the process of creating cDNA. Surely, if we think, given the confines of these decisions, the creation of a cDNA is conventional. That is not something that Myriad created, but applying that technique to the bracket gene resulted in a patentable subject matter. Then if we were to take one more step down the road of a method of claim that used the cDNA, that again would be a conventional technique, but surely it would have to be patentable because the cDNA itself was patentable. So it cannot be simply that the level of abstraction is so high that a patentee who discovers a new natural law or a new natural phenomenon has to also invent an entirely separate process for analyzing that so long as the claim is unifying. I was going to turn, because my time is short, quickly to the primer claims, because I thought that would be another good point of discussion. There, we have an error by the District Court in failing to appreciate the difference between a mechanism, Watson-Crick base pairing, and the utility of PCR. The two primers claimed in each of the claims at issue, all four of them require a pair of primers, have a utility that is not found in nature. In the decision, the District Court put that utility, if you will, in a box and said, well, that utility, PCR, depends on Watson-Crick base pairing. That's true insofar as it goes. That's how primers can prime because they can, just like probes, they can hybridize to the DNA. But that does not mean that that is a natural utility unchanged from nature as in the Funk Brothers case. If I take two fragments of DNA and I put them, if I were able to, put them in a petri dish on this podium, they would do nothing. In Funk Brothers, I took those two bacteria, which are unaltered from nature, and I put them in the petri dish. They have the state of mutual inhibition. Mann has not added anything to them. Very different from the primers where Mann has added the utility of PCR. And the Supreme Court has talked about both structure and utility in its authorities. It is clear that the utility here for the primer claims are different. Even if you don't accept our arguments on structure, the differences in structure, I think the court found below, that the primers are, of course, man-made. We acknowledge that they share sequences individually with the DNA sequence in the cell, but then compared at the combination, which is not found in nature. Both structure, the combination, and utility, PCR, are different than found in nature. So, the power has been going along as if the claims had been found invalid, and we were trying to decide whether that invalidity decision was correct. I think the issue in front of us is whether or not there is a substantial question of patentability. This is a preliminary injunction. So, what happens if I say to you, you know, I hear you talking, but I'm not sure whether you're right or wrong. A lot of science going on here, and maybe this is the sort of thing that ought to go off on a trial. But I say, I think a substantial question has been raised. So, why, what's the difference? I mean, why can't I, why can't I say in my mind as a judge reading the Supreme Court opinion, I'm not sure what the answer is. You have a situation here with your primer claims where you just snipped something clean out of nature. The sequence of the primer is exactly what you find in nature, right? The sequence of an individual primer is the same. Exactly. Right. We're not going to argue that. And primers burn. That's what they do. That's what they do when man added the utility. That's not what they do in nature in terms of a piece of DNA in the cell. But what I'm asking is whether or not what they do when man does it, is that a conventional ordinary thing one would want to do with this particular primer? And if I say there's a substantial question in my mind. I will answer your question on the primer conventional then address your preliminary injunction. That's the same thing as cDNA. Creating a cDNA is a conventional technique applied to the BRCA gene. It is no different, if you will. If you want to say that is not the product of invention, the Supreme Court has said that it is. Because it doesn't exist. That structurally doesn't exist. That comes back to your question of whether or not what the Supreme Court is saying is you need to have a non-conventional way to make cDNA. I think what Judge Clevenger is asking you is what would we get out of a trial in this case that would illuminate the issues here? Anything? I don't think so. The issue here is one of law. As to whether or not, as applied by the district court in the concepts of conventionality, do we excise the sequence that was discovered? Do we consider it? Or is it considered when it is confined to a particular tool? That is an issue of law. How to apply the Supreme Court's decision. We will be right back up here doing the same argument months from now after trial. I will respectfully say the biotech community is at sea as to how to interpret this decision. This case is a very good opportunity to do that. The question before us. You know what we have just been through. You sat here and heard the previous case about arguments whether or not the panel was answering the question that was before it and where that leads us. The question before us is it not exclusively whether or not there is a substantial question of validity and not whether or not the patent is valid or not invalid. Your Honor, that is the question, but it also underlined that question on whether or not errors of law were committed in reaching the determination that the district court did. I would submit to you that we have identified those errors of law in our brief and we would request that they be corrected. Are we agreed that there is only one method claim in front of us now? One method patent? One method patent, Your Honor. And that method patent will expire January 20-something or other? That is correct, Your Honor. So for purposes of a preliminary injunction, unless you have got a final judgment in your favor on the district court before that date, then they should moot on that patent for an injunction? An injunction, I cannot argue with you on an injunction, a preliminary injunction and a permanent injunction. And there are pending 102 and 103 challenges of the patent in the event we rule it in your favor on 101? That is correct, Your Honor. And likely going to be trial or something that, I am just saying as a matter of practical matter, it seemed to me to be very hard for you to be free to avoid a preliminary, you were not going to get a preliminary injunction before the patent expires. Before the 441 patent expires, I agree that it is unlikely, Your Honor. What you are saying, if I understand correctly, is that this legal issue does not become moot because it will affect damages? Surely it will. We will have a trial on damages, which will be a significant event. That is one additional reason for the court to weigh in here. Thank you. Thank you. We will restore two minutes of rebuttal. Thank you, Your Honor. And to keep things even then, we will add four minutes here to finish that. Thank you, Your Honor. May it please the Court. I would like to turn to the composition claims and the primers. I think it is important to remember a primer is just a segment of DNA and a probe is just a segment of DNA, an isolated DNA. And in the AMP case, the Supreme Court defined the issue as to whether a segment of DNA that has been isolated constitutes patentable subject matter. And in addition, it identified it down to a limited, just a strand of 15 or more nucleotides. When you turn to the composition claims here of the primers, which in fact are just a segment of DNA, and I turn the Court's attention to the 492, it says a pair of single-stranded DNA primers of at least 15 nucleotides in length. That fits right in with the AMP Court's articulation of what the issue before was, is a length of DNA of 15 nucleotides that has been isolated, patentable subject matter. And the answer in that opinion was clearly not. It constitutes a product of nature and natural phenomena. And the issue was squarely before the claim here as to cDNA, laboratory-made copy, right? So the dependent claim, Your Honor, does address cDNA. But to address what I believe is the Court's concern, in AMP, there is the proviso that if a cDNA is indistinguishable from a portion of the genomic DNA, that that would not constitute patentable subject matter. To soften the language in the opinion that suggested that all cDNA would be patentable under 101, they said some may not. Correct. Only if you've just copied what's in nature. Correct. And what is in the dependent claim where there is cDNA would be subject matter that would be subject to the statement by Justice Thomas that a short cDNA-produced primer that represents just a single exon sequence and therefore is exactly the same as that exon sequence is indistinguishable and is effectively a copy. And as this Court held in the Rosalind case, a copy of DNA does not constitute patentable subject matter. And so under AMP, those dependent claims... Help me out on this matter of science. What do primers do in the body? What do primers do in the body? In the body, RNA primers help prime the synthesis and the replication of DNA, and RNA and DNA are nucleic acids. That's what I thought. Now here, these claim primers are doing something else, correct? No, they're not, Your Honor. What they do... In a different way? No, I don't think so, Your Honor. As the District Court found under the findings of fact that the District Court found based on the record presented to it, that they perform the task of priming in a way that mirrors and mimics nature. And so all they do is form as the starting point for the filling in of the subsequent nucleotides that fill in the second strand of material. That also occurs in nature as well, as the District Court found in its findings of facts which have not been disturbed and have to be shown to be an abuse of discretion for the District Court to have found under the appropriate standard review. I think when he was up, he was contending that the function is entirely different from what you find in nature. Your Honor, the District Court has found that the function is not markedly changed in order to pick up the language from Chakrabarty, for example, of naturally occurring. It depends... What was the... This comes back to my concern that Judge Dyke thankfully made clear to you what I was trying to say, which is what might happen at trial. On this particular question with regard to the primers, about what the function of the primer is, was there expert testimony? Absolutely, there was, Your Honor, and it was elucidated and cited in the District Court's report by Dr. Pribnow on the issue. And there was estimate from both sides because there seems to be a disagreement between you and your adversary here as to whether the function is the same. They absolutely submitted expert testimony on the issue, along with testimony from their own in-house employees as to the nature and function of primers. What difference would it make if the function is different? I mean, that's true in all of these claims, including the method claims that we considered the first time around in the Myriad case. I mean, when you take part of the DNA, you're going to use it for something different, for making comparisons, for example. Isn't that true of every one of these method claims, that that's going to happen? Different function? It is true that man can use it for a function that might be slightly different than what it performs in the body. But I think the important point is that the structure is unaltered and therefore still constitutes a product of nature. Well, if function were the test, you'd have a problem. But then again, all these other claims would have come out differently. So function can't be the test, can it? Well, I think that you have to step back and look under the analysis articulated as well recently and confirmed by the Alice Court along with the Mayo Court. So you look at first the issue of... Answer my question. Function can't be the determinant, right? No, I don't think so, no. And I think under the Mayo-Alice test, if you're going to look at these other elements in the claim, it is undisputed in this factual record that the ability to make a primer, for example, and to amplify DNA was routine and conventional. And in fact, there's evidence in this record at the ABLE reference at JA752829 that this was already being done before the filing of this patent application and before the articulation of the entire sequence of the BRCA gene, which is a phenomenon in nature. Do you see a difference between Claim 7 and 8 and Claim 21? I do in this way, Your Honor. In claim, particularly in Claim 7 and 8 and under the current test as articulated and confirmed by Mayo and Alice, you have to go... There's no question there's unpatentable subject matter in Claim 7 and 8 because that's been adjudicated by this court that Claim 1 of the 441 patent is invalid because it contains unpatentable subject matter and rests on that. So the answer to the question is when we go and look at these other steps in the specifics of this claim, 7 and 8, they absolutely do. In that they do not... But you're not really addressing my question. Is there a difference between 7 and 8 and 21? Yes, Your Honor. There is a couple of specific differences. First of all, Claim 21 depends from Claim 20 and Claim 20 has a specific identification... I look for specific mutations in Claim 21 and in Claim 7 and 8 you don't have to do that. You do not do that. It covers all forms of mutations in a naturally occurring gene. Does that difference have any significance? Well, I think it does just because what they're using is the conventional technology to preempt in essence the field. Now, it's true that in the Alice case, it does not articulate preemption per se as a requirement of the analysis, but it informs the analysis and animates the analysis. And by attempting to preempt the field of all alterations, of all mutations, of in essence these two tools for anyone to preempt the use of comparing the two gene sequences for any purpose, which is what 7 and 8, because they depend from one claim, that depends at too high a level of the generality and effectively preempts the ability to access the sequence of the gene, which is necessary to obtain the patent ineligible abstract mental comparison of comparing two DNA sequences. So is there any difference between Claim 21 and Claim 1 that we addressed in the original Myriad decision except for the addition of the screening, which is conventional? Yes, I would say yes in that Claim 21 doesn't have any physical steps. Yeah, that's why I was asking you to put that aside. The physical steps, which everybody seems to agree are conventional. Aside from the addition of the physical steps, is there any difference between Claim 21 and Claim 1? It goes to a very specific type of RNA. Claim 1 doesn't limit itself to just RNA. It also includes the cDNA and genomic DNA. So the scope of Claim 1 is broader than Claim 21. I guess what I'm getting at is Claim 1 directed to looking for specific mutations the way Claim 21 is? No, it's not, Your Honor. Claim 1 is simply just the comparison of two sequences. And it doesn't in any way, all you're looking for is just an alteration to use the language of the claim. And it doesn't apply to a specific mutation. I see. Okay, thank you. Turning briefly to the method claims, and I think the point about conventionality of the other steps that we were discussing with opposing counsel, if you go and look at the cases, a British case, it went through the Deere v. Diamond case, and it went through a number of cases in which it articulates that the additional elements must apply some sort of inventive concept. Now, in Deere, there was an inventive concept in the other elements of the claim, in that the application of the Renyhaus equation had never been used before in a vulcanization process where, in fact, the temperature was being measured inside the mold. Now, that was a new improvement in the other elements of the claims to the application of that law of nature. That is not true, for example, in the flute case. It was also not true, for example, in the Alice case. Tying an abstract principle to a computer was not a new process. In the method claim, they're using a BRCA1 probe, right? There's a probe at work in the method claim? Yes, Your Honor. Isn't that particular probe new? The probe for the specific sequence of BRCA, depending upon the length, would be new. Would that probe be patentable? No. Why not? It would not be patentable because the probe is a product of nature. It mirrors exactly and is a copy of a segment of DNA, and therefore, under the AMP case, would not constitute patentable subject matter. Even if it could, in some way, be deemed to be patentable subject matter, in and of itself, potentially, that is not to sponsor the question. Take, for example, the Alice case, where an abstract principle was tied to a computer. A computer, of course, is patentable subject matter. In the Mayo case, the administration... This particular probe is tagged to find this particular space, right? There's no requirement in the claim that the probe be tagged. The claim just says a probe, and within the subject matter of a probe... If the probe was tagged, would it be patentable? I don't think so, Your Honor. And I don't think so for this reason. So, first, the structure of the probe, other than placing some fluorescent tag on it, is exactly as it is found in nature. And, for example, in... It's useless without a tag, isn't it? What's the probe doing without the tag? The probe is detecting whether there is a specific sequence or not within the BRCA gene. What's the function of the tag? The tag allows for a form of reporting as to whether there has been a... The natural process of hybridization to the opposite strand of the DNA has occurred or not. At the particular place? Yes. But that happens regardless of whether the tag is applied to the probe or not. Because the probe binds, rests on the Watson-Crick hybridization process of the single strand and the other single strand coming in, just as normal DNA exists in nature, but it has two strands that complement each other. Would your view differ of this particular method if the probe was tagged? No. Nobody else has ever done that, right? Oh, probes... Hadn't tagged for this particular segment of the gene? For the very particular segment of the gene, but I think it's important to distinguish what is in this claim. It covers all probes, not just a specific probe, but any probe that can be used to probe any part of the gene, which is a genus of probes, not a species of probes that shows a separate inventive concept of why that probe was developed and what the purpose of that probe was developed over what already existed in existing technologies. And therefore, it's much more analogous, I think, to the Alice case, where it makes very clear that the claims don't purport to improve the functioning of the computer itself, nor do they affect any improvement in any other technology or technical field. And it's just simply a meaningful limitation linking the use of a particular method to a particular technological environment, which was insufficient in Alice. Finally, Your Honor, this is a motion... Help me out. I mean, I know it's not in your interest to do so, but I'm getting the feeling that under your view, there really isn't much that your adversary can do with the discovery of this particular genetic sequence. That it's a nice discovery, but not much use to it in terms of being able to get a patent. Can you give me a description of what would be patentable subject matter use of, for example, the primer? Yeah, so if, as reflected in the Alice case, the role of the primer was somehow improved, as reflected in the Deere case, there was an improvement in the function of the primers over what existed in the prior art or the probes what existed in the prior art, and the claim claimed that inventive concept,  That could constitute patentable subject matter. New and non-obvious use of primer, right? That represents an advancement in the technology which does not exist here. Yeah, but let's suppose, put that aside, let's suppose that they discover that the BRCA1 and the BRCA2 genes are the source of these mutations which cause breast and ovarian cancer. And it does look as though the Supreme Court in Myriad was concerned, as was Judge Bryson, not to exclude all possible claims that would reap the rewards for that invention. What could they have done in the way of claiming that would, in your view, have passed muster under 101? So, two points, Your Honor. First of all, they were not the first to identify that there were mutations in the gene that were linked to cancer. Okay, but let's put that aside. Let's assume that they were the first ones. But I think that's important because that informs how we look at the claims. I do think that if you take a look at, for example, the claim that was ultimately upheld by this court in which the sequence was used in an in vitro assay, and that was upheld to be patentable subject matter, that is an example of a claim that could pass muster under 101 and was affirmed as such by this court. Because it's directed to a specific mutation used in that assay? It's directed to a specific use of the gene in the assay. A specific mutation or a specific gene? A specific gene because what it did is it changed the nature of the genetic structure that was being tested against in that in vitro assay along the lines of what happened in Chakrabarty where a bacterium and other genetic material was put inside the bacterium to create a new structure, a new life form not found in nature. Finally, very briefly, Your Honor, this is a preliminary injunction. The points of balance of hardships that the district court found in Ambry's favor, that in and of itself has not been disturbed by their arguments. And on that ground as well, the judgment of the court that the denial of the motion for preliminary injunction should be affirmed. Thank you. Very briefly, it's been a long morning, I know. Just that last claim that raised the plasmid of inserting the DNA into a cell, Mary didn't invent that technique either in the sense of at the abstract level that we've been talking about. As evidenced by saying it was just like as happened in Chakrabarty. It was the application of a known technique, inserting DNA into a cell to create a new organism, a new cell. It's no different than the application of probe techniques to create new probes and new primers, the same level that we're talking about. And then finally, on the primer claims themselves, it's important to remember they're not claimed as fragments. We've briefed a lot about Judge Bryson's opinion and the prior opinions, and Judge Bryson pointed out in his opinion that the problem with the broader claims to isolated fragments is that they weren't limited to probes and primers. That was the defect, that the utility that Mary had cited of those short strands of DNA was not found in the claim. And therefore, the claims covered not only probes and primers, but any possible use, in fact, of someone sitting there possessing the fragment. Here, they're claimed as primers, and that utility, Judge Dyke, is very important. I think the Supreme Court has said in Funk Brothers, I wrote it down, and I'll close with that, in commenting on the Funk Brothers' unpatentability of that new combination, that combination had never been done before, they said no new bacteria, no change in the six species of bacteria, and no enlargement of the range of their utility. That is a very large distinction with the pair of primer claims, the enlargement of utility created by Myriad here. Thank you very much. Thank you. We thank both counsel and the cases submitted.